SLT:CAC/TMM
F.#2011R00278

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

                                12-CR-065 (SLT)

    - against -

JIMMY COURNOYER <u>et</u> <u>al</u>.,

                Defendants.

- - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S RESPONSE IN OPPOSITION TO JOSE ALEJANDRO
CASTILLO-MEDINA'S PRETRIAL MOTIONS

                                        LORETTA E. LYNCH
                                        United States Attorney
                                        Eastern District of New York

Steven L. Tiscione
Toni M. Mele
Celia A. Cohen
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The defendant, Jose Alejandro Castillo-Medina, also known as "Primo" ("Castillo-Medina" or "defendant") is charged in an indictment with (1) conspiracy to import marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1)(G), and 963 (Count Two); (2) conspiracy to distribute 1,000 or more kilograms of marijuana between January 2002 and October 2011 in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii) (Count Three); and (3) a money laundering conspiracy in violation of 18 U.S.C. § 1956 (Count Seven).  The charges arose out of an investigation into an international organization involved with the large-scale trafficking of hydroponic marijuana from Canada into the United States.

By motions dated June 15, 2012, the defendant moves: (1) to dismiss Count Three on double jeopardy grounds, or in the alternative, by the doctrines of <u>Res</u> <u>Judicata</u> and collateral estoppel; (2) to dismiss the indictment for lack of evidence and (3) for severance from his co-defendants.  For the reasons set forth below, the defendant's motions should be denied.

<u>STATEMENT OF FACTS</u>

A.   <u>Background of the Investigation</u>

Since approximately 2007, the Long Island District Office of the Drug Enforcement Administration ("DEA") Task Force has been investigating several large-scale international drug

trafficking organizations based in Montreal, Canada that have formed a consortium along with a number of marijuana brokers and distributors in the United States and are actively working together to define the various territories for drug distribution, set prices and provide transportation for drug smuggling ventures (the "Consortium").  During the course of the investigation, DEA Task Force agents received information about the Consortium from multiple cooperating witnesses, whose information has proven to be reliable and has led to multiple arrests and seizures of drugs and drug proceeds.  One of the principal members within the Consortium has been identified as Jimmy Cournoyer, also known as "Cosmo."  The investigation has revealed that in just the past two or three years Cournoyer coordinated the importation and distribution of more than 100,000 pounds of hydroponic marijuana into the United States, specifically to Brooklyn and Queens, New York, from Canada.  Cournoyer also arranged to transport vast quantities of marijuana proceeds from New York to California on behalf of the Consortium.  The marijuana proceeds were then used to purchase cocaine that was exported into Canada for distribution.  This trade-based money laundering scheme resulted in enormous profits.

Among other methods, one of the principal ways in which Cournoyer and his enterprise smuggled illegal narcotics into the United States was to utilize the Akwesasne Native American

3

Reservation, which straddles the U.S. - Canadian border in upstate New York.  Employing Native American transportation networks, Cournoyer arranged for marijuana to be brought by boat across the St. Lawrence River from Canada onto the reservation, where drivers would take possession of the marijuana and transport it across the border into the United States and then deliver it to distributors in Brooklyn, New York.

      B.    <u>Castillo-Medina's Role in the Consortium</u>

Up until his arrest in November 2010, one of Cournoyer's largest marijuana distributors in Brooklyn was the defendant Castillo-Medina, also known as "Primo." Castillo-Medina  sold hundreds of pounds of marijuana per week supplied by Cournoyer, and arranged for the collection of tens of millions of dollars in narcotics proceeds.  Castillo-Medina utilized a garage in New York where the marijuana was transported in trucks from Montreal, Canada and unloaded.  From there, marijuana was sold in Brooklyn, New York and the surrounding areas.

Castillo-Medina not only distributed marijuana on behalf of Cournoyer, but he supervised workers in New York to distribute the marijuana, collect the marijuana proceeds, and deliver the drug proceeds to various bulk cash transporters who transported the money to Los Angeles, California for the purchase of cocaine.  Castillo-Medina communicated with Cournoyer via an

encrypted blackberry device that was provided to him by
Cournoyer.  The device could be used only to send encrypted text
messages to other blackberry devices on the same network and
could be erased instantly if lost or seized by law enforcement.

    C.   <u>The Curatola Case</u>

      While the DEA and USAO were continuing to investigate
the cocaine trafficking and money laundering operations of the
Consortium, a different set of DEA agents and prosecutors out of
the Central Islip Office began investigating a Long Island based
marijuana distribution group headed by Dominick Curatola.
Through the use of judicially authorized wiretaps, agents
identified numerous distributors, money launderers and
co-conspirators working for Curatola's organization.  Agents were
also able to identify several importers and the ultimate Canadian
sources of supply for Curatola's organization.  None of the
targets was in any way related to the Consortium or to the
defendants in Cournoyer.

      On November 10, 2010, Dominick Curatola and two
codefendants were charged in a sealed complaint. Castillo-Medina
was not charged at this time, and in fact, was
not even a subject of the investigation.

      On November 16, 2010, agents intercepted a telephone
call by an unknown individual setting up a money pickup from
Dominick Curatola. Based on information obtained during the

investigation, agents believed that the money was from the proceeds of Curatola's marijuana distribution activities and was going to be laundered back to Canada.  Agents conducted surveillance of Curatola and co-defendant Elizabeth Jennings, who had been identified as the courier used by the unknown telephone caller to pick up the marijuana proceeds from Curatola.  Agents observed Jennings pick up the money from Curatola and followed her back to a residence. They subsequently obtained a search warrant for the residence and executed the warrant.

Castillo-Medina was stopped outside the residence with a Canadian passport and five mobile telephones. Inside the residence, law enforcement officers found bundles of currency that matched the amount that the unknown caller and Curatola discussed on the previously-intercepted telephone call. In addition, law enforcement officers found a half ounce of marijuana on a desk in the basement, two money counting machines and approximately a half pound of marijuana in a closet in the basement. Law enforcement officers further recovered a drug ledger with dates of transactions and amounts of narcotics proceeds totaling over $3 million dollars, and another bag containing approximately $500,000.00 in U.S currency. Castillo-Medina, who was later identified as the telephone caller who arranged the money pickup between Jennings and Curatola, was arrested and charged in a complaint for aiding and abetting the

distribution of a controlled substance.   The only evidence found during the search warrant that related to the <u>Courtola</u> case was the currency that matched the amount that Catillo-Medina and Curatola discussed on the previously-intercepted telephone call. The remaining $500,000 recovered from a separate bag, the two money counting machines and the drug ledger were evidence of Castillo-Medina's work for Cournoyer and the Consortium.

On December 16, 2010, Curatola and the four arrested co-defendants, including Castillo-Medina, were indicted in <u>United States v. Curatola et al.</u>, 10 CR 991 (JS).  A subsequent superseding indictment filed on February 3, 2011 added eight additional defendants.

With the exception of Castillo-Medina and one other defendant (who worked for Castillo-Medina throughout his role as a distributor for the Consortium and also picked up the money related to Curatola on November 16, 2010), none of the other 12 defendants charged in <u>Curatola</u> had any connection whatsoever to the Consortium.  Moreover, the investigation revealed that Curatola and his organization were supplied with marijuana from completely different Canadian sources of supply.  Castillo-Medina was not a distributor for Curatola or the Canadian sources supplying Curatola.  Rather, the investigation revealed that Castillo-Medina, as a courtesy to an associate in Canada, simply arranged for a single money pickup from Curatola because

7

Curatola's usual money couriers and launderers were unable to pick up the money on November 16, 2010.  Indeed, the drug ledger that was found during the search did not make any reference to the November 16, 2010 money pickup, but was instead related to the millions of dollars that had been collected by Castillo-Medina on behalf of the Consortium.

On August 5, 2011, Castillo-Medina pleaded guilty to participating in a marijuana distribution conspiracy in violation of 21 U.S.C. Section 846.  Pursuant to his plea agreement, the defendant's plea was strictly limited to his actions on November 15, 2010 and November 16, 2010 - - the single money pickup for Curtola.  (<u>See</u> paragraph 5a, attached as Exhibit A)[1]  Indeed, in his sentencing memorandum filed on February 27, 2012 (attached as Exhibit B), the defendant's attorney argued that his role in that the charged conspiracy was limited to a single occasion:

> Insofar as the charges relate to Mr. Castillo, it is alleged that <u>on a single occasion, November 16 2010, he possessed the equivalent of twenty to forty kilos of marihuana</u>, based upon the amount of money seized from a co-defendant. Although the Defendant reaffirms his guilt and accepts full responsibility for his limited role in the offense, he categorically denies that he was a leader, manager, or supervisor in it. To the extent that the PSIR contains allegations of "fact" that suggest that Mr. Castillo was more than a passing participant in the offense, it is wrong.

_____

[1]  This exhibit will be provided to Court, however, it will not be publically filed on ECF.

Id. at 12 (emphasis added). In further expounding upon Castillo-Medina's "passing participation" in the drug dealing activities of his co-defendants, his attorney noted the lack of evidence connecting the defendant to the organization charged in Curatola:

> Remarkably, although the PSIR provides a wealth of detailed information based upon various investigative leads and tools including extensive wiretaps, physical surveillance, monitored deliveries, and post-arrest admissions by various defendants, it is notable that in only two paragraphs is there any mention of the Defendant and the role it is suggested he played in the offense. Thus, in relevant part, it is claimed at ¶¶ 10-11 of the PSR that between November 15th and November 16th of 2010 "arrangements" were made between Mr. Castillo and co-defendant Curatola to meet Castillo's alleged "money courier," codefendant Elizabeth Jennings. Later that day, Castillo was seen entering and exiting Jennings residence several times. Elsewhere in the forty paragraphs of the PSIR the record is wholly silent as to Mr. Castillo, or his connection, if any, to the remaining co-defendants. In this regard, there is no evidence which indicates that he had anything to do with the co-defendants, at any time, save for Ms. Jennings on one occasion. Indeed, the PSIR does not assert that Castillo met with or talked to the co-defendants, in person, by phone or text, at any time before November 15, 2010. Nor does it propose that he supplied marihuana or cocaine or any other drugs to the codefendants, or that he had purchased illicit substances from them. Likewise, there is no allegation that he received drug proceeds from the co-defendants, or that he had provided payments to them for any illicit activity.

        *     *     *

> In this regard, although <u>Mr. Castillo</u>
> <u>concedes that he asked co-defendant Jennings</u>
> <u>on the final day of the offense to pick up</u>
> <u>some money from a person unknown to him as a</u>
> <u>favor to a third party</u> this was a request to
> an acquaintance and not an order to a
> subordinate who he otherwise supervised or
> managed.

Id. at 16-18 (emphasis added).

On March 27, 2012, Castillo-Medina filed a motion for reassignment of the present case to the Honorable Joanna Seybert as a related case to <u>Curatola</u>.  Both Judge Seybert and Judge Townes denied the defendant's motion.

<u>ARGUMENT</u>

I.  THE DEFENDANT'S MOTION TO DISMISS COUNT THREE ON DOUBLE <u>JEOPARDY GROUNDS SHOULD BE DENIED</u>

The defendant moves to dismiss Count Three on the ground that prosecuting him on that count would violate the Fifth Amendment's Double Jeopardy Clause given that the defendant pleaded guilty in <u>Curatola</u> to a lesser included offense of Count Three.  The defendant claims that because the two offenses are the same, prosecution of the greater offense is precluded by the prior prosecution for the lesser offense.  <u>Id</u>.  But the defendant ignores the fact that the conspiracy to which he pleaded guilty in <u>Curatola</u> was an entirely separate conspiracy, and therefore there is no violation of double jeopardy.

A.  <u>Applicable Law</u>

The Double Jeopardy Clause of the United States Constitution protects against three different scenarios: a second prosecution for the same offense after an acquittal for that offense; a second prosecution for the same offense after conviction for that offense; and multiple punishments for the same offense. <u>United States v. Estrada</u>, 320 F.3d at 180 (citing <u>Schiro v. Farley</u>, 510 U.S. 222, 229 (1994)). "A double jeopardy claim cannot succeed unless the charged offenses are the same in fact and in law." <u>Id</u>. (citing <u>United States v. Nersesian</u>, 824 F.2d 1294, 1319 (2d Cir. 1987)).

In considering whether two charged offenses are actually the "same offense," courts more typically consider situations where a defendant has been charged with violating different statutes based on the same general conduct. To address that scenario, where "the same act or transaction constitutes a violation of two distinct statutory provisions," <u>Blockburger v. United States</u>, 284 U.S. 299, 306 (1932), courts apply the familiar "same elements" test adopted in <u>Blockburger</u>. The <u>Blockburger</u> test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution." <u>United States v. Dixon</u>, 509 U.S. 688, 696 (1993). The <u>Blockburger</u> test is a categorical one: if each statute charged contains an element not contained in the other,

11

each charge alleges a different offense; even if the underlying
conduct, and the evidence to prove that conduct, is precisely the
same, the charges do not constitute the "same offense" for double
jeopardy purposes. United States v. Chacko, 169 F.3d 140, 146-48
(2d Cir. 1999) (holding that the same underlying conduct may
support charges for bank fraud under 18 U.S.C. § 1344 and making
a false statement to a federally insured institution under 18
U.S.C. § 1014 because the elements of the two statutes differ).

        Necessarily, the analysis differs when a defendant is
charged, as in the present case, more than once under the exact
same statute, based on purportedly different conduct. The
Blockburger "same elements" test obviously offers no assistance
when a defendant faces fairly strict application of the "same
elements" test, "the relevant question ... is whether the two ...
charges are the same 'in fact," i.e., whether [the defendant] is
being prosecuted twice for the same conduct." United States v.
Asher, 96 F.3d 270, 273 (7th Cir. 1996). "It is well-settled
that a defendant may be charged and prosecuted for the same
statutory offense multiple times when each prosecution is based
on discrete acts that each constitute a crime." United States v.
Goodine, 400 F.3d 202, 208 (4th Cir. 2005) (citing, inter alia,
United States v. Walsh, 194 F.3d 3 7, 46 (2d Cir. 1999)
(determining that indictment alleging same statutory violation in
two counts based on two different instances of same act occurring

12

in "different but overlapping time frames" was not multiplicitous)); see generally United States v. Asher, 96 F.3d at 274 n.4 ("it is important to note that the Double Jeopardy Clause does not prohibit successive prosecutions of an individual for distinct unlawful acts taken within a single course of criminal conduct") (citations omitted); United States v. Kee, No. 98 Cr. 778 (DLC), 2000 WL 863117, at *4 (S.D.N.Y. June 27, 2000) ("Neither the principle of multiplicity nor the Double Jeopardy Clause prevents a defendant's being charged with more than one violation of the same statute where different acts underlie each violation.") (citing, inter alia, United States v. Walsh, 194 F.3d at 46-47).

B.   Analysis

In the instant case, Castillo-Medina is being charged with two completely separate conspiracies and, therefore, there is no double jeopardy violation.  The charges to which he pleaded guilty in the Curatola case were based on a single isolated instance in which the defendant agreed to provide a courier for a money pickup as a favor for a friend.  Indeed, not only is the plea agreement that the defendant signed limited to that single transaction that took place on November 15 and 16 of 2010, but the defendant's allocution during his plea makes it clear that the money pickup was a one-time occurrence.  See August 5, 2011 transcript at 15-18 (attached as Exhibit C).  That instance,

13

however, has nothing to do with the defendant's role as a
marijuana distributor for the Consortium conspiracy.  With
respect to the defendant's role as a Consortium distributor,
several cooperating witnesses will testify that they picked up
marijuana from Canada and delivered it the defendant in Brooklyn,
New York per Cournoyer's instructions.  Other cooperating
witnesses will testify about how the defendant distributed the
marijuana and collected marijuana proceeds all on behalf of the
Consortium.  None of these cooperating witnesses had any
connection to the Curatola organization, and none of the
marijuana deliveries were related to the <u>Curatola</u> case.
Accordingly, the fact that the elements of the two offenses are
the same is meaningless, and does not invoke the double jeopardy
clause.

The defendant further claims that the majority of the
factors set forth in <u>United States v. Korfant</u>, 771 F.2d 660, 662
(2d Cir. 1985) support the inference that the two conspiracies
amount to the same offense for double jeopardy purposes.[2]  But
the defendant draws a superficial comparison between the <u>Curatola</u>
case and the present case.  An examination of the actual evidence

---

[2]     The factors include (1) the criminal offenses charged
in successive indictments; (2) the overlap of participants; (3)
the overlap of time; (4) similarity of operation; (5) the
existence of common overt acts; (6) the geographic scope of the
alleged conspiracies or location where overt acts occurred; (7)
common objectives; and (8) the degree of interdependence between
alleged distinct conspiracies.

14

and the participants in each case demonstrates that these are two distinctly separate conspiracies.  For example, the evidence that was seized from the November 16, 2010 search of the residence where Castillo-Medina was stopped outside revealed evidence that supported the defendant's participation in <u>Curatola</u>, i.e., bundles of currency that matched the amount discussed on the intercepted telephone call.  During the search, however, law enforcement officers also found evidence that supported the defendant's participation in the Consortium, i.e., two money counting machines, a drug ledger with dates of transactions and amounts of narcotics proceeds totaling over $3 million dollars, and another bag containing approximately $500,000.00 in U.S currency.  Although all of the evidence was produced to Castillo-Medina in the <u>Curatola</u> case, only the currency that matched the amount discussed on the telephone was relevant to that case.[3]  The remaining evidence demonstrates the defendant's role as a major distributor for Cournoyer.

Moreover, while the defendant's limited role in the <u>Curatola</u> case overlapped with his long standing role as a distributor for Cournoyer, the overlap in time is irrelevant.  The defendant admitted in his <u>Curatola</u> plea that when he agreed

---

[3]     The government was obligated to produce all of the evidence seized in the <u>Curtola</u> case regardless of the fact that it did not pertain to that conspiracy because the probable cause for the search warrant was based on the <u>Curtola</u> investigation.

to pick up marijuana proceeds, that it was one-time favor.  The fact that he agreed to do that favor on the side while acting as a distributor for the Consortium does not in any way suggest the two conspiracies are the same.  Indeed, if overlap in time were sufficient to preclude a charge against a defendant for a second crime, it would allow defendants to commit several crimes in the same period knowing that they could only be charged with one. Here too, the defendant cannot avoid being charged for his role as a distributor in the Consortium merely because he pled to a "one-off" deal that occurred during the same time-period.[4]

In addition, there is virtually no overlap of participants.  Of the 13 defendants charged in Curatola, none of them had any connection whatsoever to the Consortium except for the defendant and Elizabeth Jennings, a worker who assisted Castillo-Medina with money laundering activities on behalf of the Consortium.  Jenning's connection to the Curatola conspiracy was limited to the same solitary money transaction for which Castillo-Medina was a part.  Indeed, it is not surprising that when the defendant agreed to the one-time money pick-up for the

---

[4]     Likewise, the same argument applies with respect to the geographic scope factor.  The fact that the defendant distributed marijuana for the Consortium in the Eastern District of New York and agreed to the money pickup on behalf of the Curatola organization in the same district is meaningless when none of the participants or facts overlap.

16

Curatola organization, he decied to use the same worker who he already trusted.

Furthermore, the investigation revealed that Curatola and his organization were supplied with marijuana from completely different Canadian sources of supply.[5]  Castillo-Medina was not a distributor for Curatola or the Canadian sources supplying Curatola.  Rather, the investigation revealed that the defendant, as a courtesy to an associate in Canada, simply arranged for a single money pickup from Curatola because Curatola's usual money couriers and launderers were unable to pick up the money on November 16, 2010.  Indeed, the drug ledger that was found during the search did not make any reference to the November 16, 2010 money pickup, but was instead related to the millions of dollars that had been collected by Castillo-Medina on behalf of the Consortium.

Finally, there is no danger in this case that the government is attempting to break up a single conspiracy into multiple segments.  See Korfant, 771 F.2d at 662; see also United States v. McGowen, 58 F.3d 8, 13 (2d Cir. 1995) (the Korfant inquiry implements a policy forbidding the government from multiplying opportunities to prove a conspiracy, in derogation of

---

[5]     The fact that both conspiracies had common objectives does not render these conspiracies the same.  The instant case is no different than a scenario where a defendant who agreed to rob two different banks with two completely different people is charged with two separate conspiracies.

the Double Jeopardy clause, by breaking up a single conspiracy into multiple segments); United States v. Calderone, 982 F.2d 42, 48 (2d Cir.1992) ("The Government cannot be permitted to retry defendants on smaller and smaller conspiracies, wholly contained within the scope of a large conspiracy, until it finds one small enough to be proved to the satisfaction of a jury."). In this case the government is not charging the defendant with smaller conspiracies contained within the scope of one large conspiracy. For all of the reasons set forth above, the Consortium conspiracy is an entirely separate conspiracy from the Coratola conspiracy. Although the defendant's role in the Curatola conspiracy was small, his role in the Consortium was as a major distributor for many years. Accordingly, the defendant can and should be tried separately for both crimes.[6]

_____

[6]    The defendant also argues that the doctrine of res judicta warrants of dismissal of count three. Res judicata provides that a final judgment on the merits bars a subsequent action between the same parties over the same cause of action. See Channer v. Dept. of Homeland Security, 527 F.3d 275, 279 (2d Cir. 2008). Provided the parties have had a full and fair opportunity to litigate the matter, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Id. citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1463 (2d Cir.1996). For all of the reasons set forth above as to why the charges in this case are not precluded by double jeopardy, the charges are similarly not precluded by the doctrine of res judicata. The defendant is not charged here with the same conspiracy that he pled to in Curatola, and therefore, there is no judgment that bars the charges against the defendant in the present case.

II.  THE DEFENDANT'S MOTION TO DISMISS COUNT THREE ON
<u>COLLATERAL ESTOPPEL GROUNDS SHOULD BE DENIED</u>

    A.  <u>Applicable Law</u>

    The doctrine of collateral estoppel means "simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." <u>Ashe v. Swenson</u>, 397 U.S. 436, 443 (1970).  In <u>Ashe</u>, the Supreme Court held that the doctrine of collateral estoppel, as applied to criminal proceedings, precludes the government from relitigating <u>an issue of ultimate fact</u> involving the same parties that was necessarily determined in favor of a defendant.  <u>Id</u>. at 444 (emphasis added).  The Court's task in <u>Ashe</u>, and in other cases where the defendant argued collateral estoppel, was to determine "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." <u>Ashe</u>, 397 U.S. at 444, 90 S.Ct. at 1194.

    B. <u>Analysis</u>

    In the instant case, the doctrine of collateral estoppel does not apply for two reasons.  First, the defendant pleaded guilty pursuant to a plea agreement with the government. Therefore, neither a jury nor a judge decided an issue of ultimate fact with respect to the defendant's role in <u>Curatola</u>. Second, even if the doctrine of collateral estoppel could apply,

the government is not in danger of relitigating anything related to the defendant because, as set forth above, the Curatola conspiracy and the Consortium were two entirely separate conspiracies.  Accordingly, the doctrine of collateral estoppel does not warrant dismissal of Count three.

III. THE INDICTMENT SHOULD NOT BE DISMISSED FOR LACK OF EVIDENCE

The defendant argues that the indictment should be dismissed because the government has not produced evidence of the defendant's participation in the alleged conspiracy to import marijuana or the alleged money laundering conspiracy.  But the defendant ignores the fact that much of the evidence produced in the Curatola case - the drug ledger, money counting machines and $500,000 -- was evidence of the defendant's involvement in the importation of marijuana, the distribution of marijuana and money laundering.  The defendant was a distributor on behalf of Cournoyer for marijuana that was being imported from Canada.  His receipt of the marijuana from Canada, its further distribution and the laundering of the proceeds is evidenced by the large amounts of money recorded in the drug ledger, the two money counting machines and the $500,000 that was found at the searched residence.  In addition, cooperator testimony will help to further explain the defendant's role in the Consortium and will interpret the drug ledger.

20

The defendant also argues that evidence gathered against his co-conspirators after his arrest and throughout 2011 cannot be introduced against him without some evidence that the defendant in fact participated in the conspiracy after the date of his incarceration.  But such evidence can be used against the defendant to prove his participation in the conspiracy as long as he did not withdraw from the conspiracy.  It is well-settled that participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." See United States v. Diaz, 176 F.3d 52, 98 (2d Cir.1999) (quoting United States v. Greenfield, 44 F.3d 1141, 1150 (2d Cir.1995)).  Although withdrawal from a conspiracy is an affirmative defense, mere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal. United States v. Eppolito, 543 F.3d 25, 49 (2d Cir.2008).  The defendant "must also show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." Eppolito, 543 F.3d at 49.  Although the court in United States v. Leslie found that "arrest or incarceration may constitute a withdrawal from a conspiracy," it also specifically held that "it does not follow that in every instance it must." Leslie, 658 F.3d 140, 143 (2d Cir) (citing United

21

States v. Flaharty, 295 F.3d 182, 192 (2d Cir. 2002).  In the trial context, evidence of imprisonment during a conspiracy is merely a relevant fact that entitles the defendant to a jury instruction on withdrawal.  See id.  The jury decides whether imprisonment constitutes a withdrawal "in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence." United States v. Panebianco, 543 F.2d 447, 454 n. 5 (2d Cir.1976).  The burden remains on the defendant to present affirmative evidence that he withdrew from the conspiracy.  Leslie, 658 F.3d at 143.  The defendant's imprisonment is but one fact to consider in deciding whether withdrawal occurred.  Id.  Accordingly, unless the defendant presents evidence of a withdrawal from the Consortium, he will still be responsible for the entire Consortium conspiracy while he was incarcerated and, therefore, evidence gathered against his co-conspirators after he was arrested will be admissible against him.

IV.  CASTILLO-MEDINA'S MOTION FOR A SEVERANCE FROM HIS CO-DEFENDANTS SHOULD BE DENIED

    A.  Applicable Law

        1. General Principals: Jointly Charged Defendants Should be Jointly Tried

Federal Rule of Criminal Procedure 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or

transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).  Under the Rule, "a non-frivolous conspiracy charge is sufficient to support joinder of defendants."  United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988).  The Second Circuit has interpreted the language of Rule 8(b) to mean that defendants may be joined if they are alleged to have committed acts "arising out of a common plan or scheme" or acts that are "unified by some substantial identity of facts or participants."  United States v. Ashley, 905 F. Supp. 1146, 1164 (E.D.N.Y. 1995) (citing United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989); see, e.g., United States v. Schlesinger, 360 F.Supp.2d 512 (E.D.N.Y. 2005); United States v. Allamon, No. 04 CR 1231 (JSR), 2005 WL 2542905 (S.D.N.Y. Oct. 11, 2005). See also United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988) (joinder proper where proof of one distinct scheme is indispensible for a full understanding of the other).

"There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Bernstein, 533 F. 2d 775, 789 (2d Cir. 1976).  The presumption in favor of joint trials is particularly strong when the crimes charged involve "a common plan or scheme and defendants have been jointly indicted." United States v. Cardascia, 951

F.2d 474, 482 (2d Cir. 1991).  This strong preference reflects

several principles, as the Supreme Court has forcefully stated:

> It would impair both the efficiency and the
> fairness of the criminal justice system to require
> . . . that prosecutors bring separate proceedings,
> presenting the same evidence again and again,
> requiring victims and witnesses to repeat the
> inconvenience (and sometimes trauma) of
> testifying, and randomly favoring the last-tried
> defendants who have the advantage of knowing the
> prosecution's case beforehand. Joint trials
> generally serve the interests of justice by
> avoiding inconsistent verdicts and enabling more
> accurate assessment of relative culpability –
> advantages which sometimes operate to the
> defendant's benefit. Even apart from these
> tactical considerations, joint trials generally
> serve the interests of justice by avoiding the
> scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987).  Thus, while joint

trials may invite some prejudice to defendants, "[t]he risks of

prejudice attendant in a joint trial are presumptively outweighed

by the conservation of time, money and scarce judicial resources

that a joint trial permits." United States v. Jimenez, 824 F.

Supp. 351, 366 (S.D.N.Y. 1993).

     In recognition of the compelling interests served by

joint trials, it is well-established that severance motions "are

committed to the sound discretion of the trial judge." United

States v. Casamento, 887 F. 2d 1141, 1149 (2d Cir. 1989), cert.

denied, 439 U.S. 1081 (1990); United States v. Torres, 901 F. 2d

205, 230 (2d Cir.), cert. denied, 498 U.S. 906 (1990).  However,

"in exercising this discretion, the Court must pay head to the powerful institutional interests in judicial economy favoring joint rather than separate trials." <u>United States v. Henry</u>, 861 F. Supp. 1190, 1199 (S.D.N.Y. 1994).  For example, consideration of "the burdens upon the criminal justice system imposed by separate trials has given rise to a <u>strong presumption</u> in favor [of] joint trials and led courts to erect high barriers to defendants who move for severance." <u>Id</u>. (emphasis added).

### 2. Defendant Must Show Severe Prejudice or Violation of a Specific Right

District courts should grant a severance under Rule 14 only if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro</u>, 506 U.S. at 539.  As the cases in this circuit have made clear, severance is not warranted unless the denial of such relief would so severely prejudice a defendant that he could not obtain a constitutionally fair trial.  <u>See</u>, <u>e.g.</u>, <u>United States v. Locascio</u>, 6 F.3d 924, 947 (2d Cir. 1993), <u>cert. denied</u>, 114 S.Ct. 1465 (1994); <u>United States v. Lasanta</u>, 978 F.2d 1300, 1306 (2d Cir. 1992) (citing <u>United States v. Cervone</u>, 907 F.2d 332, 341 (2d Cir. 1990), <u>cert. denied</u>, 498 U.S. 1028 (1991)); <u>United States v. Tutino</u>, 883 F.2d 1125, 1130-31 (2d Cir. 1989), <u>cert. denied</u>, 493 U.S. 1081 (1990).  Defendants do

25

not meet this burden "merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540; United States v. Carson, 702 F. 2d 351, 366 (2d Cir.) ("That the defendant would have had a better chance of acquittal at a separate trial does not constitute substantial prejudice."), cert. denied, 462 U.S. 1108 (1983).  In this circuit, to warrant severance the defendant must show that prejudice from a joint trial "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998). Castillo-Medina has not met this burden.

Notably, the Supreme Court has ruled that mutually antagonistic defenses are not prejudicial per se.  Zafiro, 506 U.S. at 537 (four defendants not entitled to severance because of "mutually antagonistic defenses" even where all the defendants placed blame for ownership of narcotics on another defendant at trial).  Furthermore, after Zafiro, courts in this district have generally exercised their discretion by denying severance motions based on "antagonistic" defenses, not granting them.  See, e.g., Persaud v. United States, No. 04 CV 2861, 2005 U.S. Dist. LEXIS 45527 (E.D.N.Y. Dec. 28, 2005); United States v. Mahaffy, 446 F. Supp. 2d 115 (E.D.N.Y. 2006); United States v. Schlegel, No. 06 CR 0550 (JS), 2009 WL 3837305 (E.D.N.Y. Nov. 16, 2009); United States v. Kahale, No. 09 CR 159 (KAM), 2010 WL 456860 (E.D.N.Y.

Feb. 3, 2010).  When courts in the Eastern District have granted post-Zafiro severance motions based on antagonistic defenses, it has been because the defendants' theories necessarily could not, as a matter of logic, accept both as true.  See, e.g., United States v. Basciano, No. 05 CR 060 (NGG), 2007 WL 3124622 at *9 (E.D.N.Y. Oct. 23, 2007) ("the jury cannot logically accept both Basciano's defense that he rescinded the Pizzolo hit and Mancuso reordered it, and Mancuso's defense that he had no involvement in the Pizzolo murder"); United States v. Copeland, 336 F.Supp.2d 223 (E.D.N.Y. 2004).

Accordingly, where there is a risk of prejudice, "the tailoring of the relief to be granted, if any, is left to the district court's sound discretion."  Id. at 937-38; United States v. Harwood, 998 F.2d 91, 95 (2d Cir.), cert. denied, 114 S.Ct. 456 (1993).  Even when the risk of prejudice from conflicting defenses is substantial, "less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice."  Id.  Juries are presumed to follow such curative instructions.  Id. (citing Richardson v. Marsh, 481 U.S. at 211).

    B.   Argument

        1.   Compelling Interests Mandate a Single Joint Trial

Judicial economy, which is "the primary factor to be considered by the district court in the exercise of its discretion," requires that this case be tried jointly . <u>Jimenez</u>, 824 F. Supp. at 366.  Due to the nature of the charged conspiracy, the proof against Castillo-Medina is inextricably intertwined with that of his co-defendants.  Each co-defendant had a necessary role and was a crucial link in the effectiveness and success of the narcotics and money laundering conspiracies. Thus, efficiency begs a joint trial to facilitate a proper and non-duplicative presentation of the structure of the conspiracy and each defendant's role in that structure.  Moreover, a majority of the witnesses who the government anticipates calling to testify against Castillo-Medina will also testify against his co-defendants.  Thus severing Castillo-Medina from the case would result in virtually two identical trials.  <u>See</u> <u>United States v. Milan</u>, 834 F. Supp. 78, 81 (S.D.N.Y. 1993) (finding that where "the same body of evidence is admissible against . . . defendants, a severance would result in several lengthy and duplicative trials" and "a waste of judicial and law enforcement resources").  In addition to the inefficiency of producing substantially the same evidence and witnesses, the process of selecting two separate juries would also increase the total time required to try the defendants.  <u>See</u> <u>United States v. Gambino</u>, 729 F. Supp. 954, 970 n.18 (S.D.N.Y.) ("Jury selection alone in

28

cases of this type can be prolonged and thus add greatly to the time spent on separate trials."), rev'd in part on other ground, 920 F. 2d 1108 (2d Cir. 1990), cert. denied, 502 U.S. 810 (1991). The Court has designated this case to be complex and the Government expects that a trial in this case will take approximately one month.  Accordingly, given the fact that the same evidence and same witnesses will be offered to prove Castillo-Medina's role in this conspiracy, a joint trial is warranted.

Finally, a single trial of the charges will best avoid the "scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. at 210.  By presenting the complete picture of the circular narcotics scheme to the jury, there is a greater likelihood that justice will be accomplished. Id.; Milan, 834 F. Supp. at 81 ("the present case involves a cohesive heroin distribution organization whose operation, while encompassing many participants, can be readily and best understood by a single jury"); United States v. Badalamenti, 662 F. Supp. 1542, 1545 (S.D.N.Y. 1987) ("It was only by putting together the voluminous results of such continuous surveillance that the circumstantial evidence fitted together like a crossword puzzle to show that the defendants were involved in a large-scale international conspiracy to import drugs") aff'd sub. nom., United States v. Casamento, 887 F.2d 1141.  Here, the jury will best understand

how the conspiracy worked if they see all the players in one trial.  For example, Cournoyer instructed others to drive marijuana from Canada down to New York where Castillo-Medina and other distributors (such as co-defendant Tashetti) collected the marijuana, distributed it and either sent the marijuana proceeds back to Canada or shipped the marijuana proceeds to California, where they were used to purchase cocaine.  In order to get a full picture of this overarching criminal scheme, it is necessary that there be a joint trial to show that the defendants were involved in one large-scale international criminal enterprise.  Therefore, given the economic waste caused by severance and the judicial interest in presenting the conspiracy to one informed jury, the circumstances favor a joint trial.

> 2. **Castillo-Medina Has Failed to Show Severe Prejudice or Violation of Rights From a Joint Trial**

The defendant further argues that severance is warranted on the grounds of spillover prejudice because he is not charged in all counts of the indictment.  In support of this argument, he sets forth three reasons why severance is proper, namely: (1) severance from Cournoyer is proper because of the "markedly different degrees of culpability" between Castillo-Medina and Cournoyer; (2) severance from Galebi and Taloni is proper because these defendants are charged in different narcotics conspiracy counts than Castillo-Medina; and (3)

severance from Taschetti is proper because Castillo-Medina was incarcerated during the period of time Taschetti was involved in the narcotics conspiracy. (Def.'s Mot. at 4-5). As set forth below, Castillo-Medina's arguments fail to show spillover prejudice and do not justify severance.[1]

The most common basis on which severance is sought is prejudicial spillover. This circuit has found prejudicial spillover to occur when "evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice." United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992); see also

---

[1] Castillo-Medina also vaguely argues that his defense at trial might conflict with that of his co-defendants. (Def.'s Mot. at 5) However, Castillo-Medina has failed to articulate any specifics about how his defense or the defense of his co-defendants will conflict. As stated above, it is well established that antagonistic defenses do not compel severance. For example, in Zafiro, each defendant claimed that he was innocent and accused the other of the criminal conduct charged in the indictment. 113 S.Ct. at 937-38. The Supreme Court held that severance was not required simply because a defendant may have a better chance of acquittal in a separate trial. Id. at 938. As Judge Nickerson has explained: "[a] defendant is free to defend himself as he chooses, and were a severance required whenever such a defense might potentially implicate a co-defendant, then few if any defendants could be tried jointly." United States v. Praetoris, 462 F. Supp. 924, 928 (E.D.N.Y. 1978). An "antagonistic defense" can give rise to a severance motion only where "a defendant's counsel becomes a 'second prosecutor,' who 'in order to zealously represent his client . . . [does] everything possible to convict the other defendant.'" United States v. Volpe, 42 F.Supp.2d 204, 210 (E.D.N.Y. 1999) (quoting United States v. Tootick, 952 F. Supp.2d 1078, 1082 (9th Cir. 1991)). There is not a claim here that Castillo-Medina's co-defendants will attempt to "point the finger" at one another. This argument is not an "antagonistic defense" that requires severance.

31

United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998)
("'Prejudice' occurs in joint trials when proof inadmissible
against a defendant becomes a part of his trial solely due to the
presence of co-defendants as to whom admission is proper.").  The
Second Circuit has held that when multiple defendants are charged
in a conspiracy, spillover prejudice is relevant to a severance
analysis only where that evidence could not be admitted against a
defendant if he were to have been tried separately.  See United
States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997).  The nature
of conspiracy trials often require the government to produce much
of the same evidence to prove the existence and scope of the
conspiracy, and therefore, defendants charged with conspiracy
violations who seek severance bear an "extremely heavy burden."
United States v. Vanwort, 887 F.2d 375, 384 (2d Cir. 1989)
(quoting United States v. Friedman, 854 F.2d 535, 563 (2d Cir.
1988), cert. denied, 490 U.S. 1004, 104 L. Ed. 2d 153, 109 S. Ct.
1637 (1989)) (internal quotation marks omitted), cert.
denied, 495 U.S. 906, 109 L. Ed. 2d 290, 110 S. Ct. 1927 (1990);
see also United States v. Muyet, 945 F. Supp. 586, 596 (S.D.N.Y.
1996) ("[C]laims of prejudicial spillover rarely succeed,
particularly where the defendant advancing the claim is charged
along with other defendants in a narcotics conspiracy.") (citing
United States v. Gambino, 809 F. Supp. at 1074 (S.D.N.Y. 1992);
United States v. Rahman, 854 F. Supp. 254, 264 (S.D.N.Y. 1994)

("There is no risk of prejudice where much of the evidence pointed to by defendants would be admissible in separate trials against each defendant, because evidence of the full nature and scope of the conspiracy is admissible, even at the trial of lesser participants.").

In the instant case, the defendant has failed to demonstrate prejudice.  The defendant argues that because he is not charged with all counts in the indictment, he will suffer prejudice.  Courts, however, have not required a defendant to be charged with all counts of a conspiracy in order to be jointly tried with co-conspirators in a fair and non-prejudicial manner. Indeed, courts in this circuit have frequently held that "severance will rarely be appropriate simply because one defendant is charged with fewer or less culpable acts than his co-defendants, or because there is less evidence against him. Differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." United States v. Robles, 2005 U.S. Dist. LEXIS 7168 *7 (S.D.N.Y. 2005)(citing United States v. Scarpa, 913 F.2d 933, 1015 (2d Cir. 1990)); see also United States v. Carson, 702 F.2d at 366-67.

Specifically, the defendant argues that he will suffer spillover prejudice because Cournoyer is charged with a

33

Continuing Criminal Enterprise ("CCE") (Count One), conspiracy to export cocaine (Count Four), conspiracy to distribute cocaine (Count Five), and use of firearms (Count Six), while Castillo-Medina is not charged in those counts.  Castillo-Medina argues that the jury will somehow be confused, and ultimately hold Castillo-Medina guilty as a result of Castillo-Medina's ties to Cournoyer.  However, Castillo-Medina fails to show how a jury would confuse separate criminal acts and hold Castillo-Medina guilty when the evidence constituting each defendant's role, while overlapping, is different from the evidence necessary to prove Castillo-Medina's role in the conspiracy.  The Second Circuit recognizes that spillover prejudice is reduced where the evidence against each defendant is "straightforward" and unlikely to confuse the jury. See United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996); United States v. Chang An-Lo, 851 F.2d 547, 556 (2d Cir. 1988).  In fact, courts in this circuit have been unwilling to sever a defendant absent a specific showing of spillover prejudice when his co-defendant is separately charged with CCE and narcotic offenses for which not all defendants are charged.  See United States v. Bourne, 2011 U.S. Dist. LEXIS 107530 (E.D.N.Y. 2011) (denying motion to sever for spillover prejudice where moving defendant is not charged with continuing criminal enterprise or with narcotics distribution attributable to co-defendant but is charged with conspiracy to launder money)

34

(citing <u>United States v. Miller</u>, 116 F.3d at 679 (holding court "should grant a motion for severance only if there is a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence.")).  Therefore, because the charges against the defendants are straightforward and will be easy for a jury to segregate, there is no danger of spillover prejudice from a joint trial.

While courts recognize that cases may arise in which an overwhelming volume of evidence against one defendant so dwarfs the evidence presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice, in this case the additional evidence against Cournoyer is not so overwhelming.  Much of the evidence the government will offer to prove conspiracy to import marijuana (Count Two), conspiracy to distribute marijuana (Count Three), and money laundering conspiracy (Count Seven) will be directly admissible against both Cournoyer and Castillo-Medina.  <u>See</u> <u>United States v. Rosa</u>, 11 F.3d 315, 341 (2d Cir. 1993) ("Evidence at the joint trial of alleged co-conspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."); <u>United States v. Spinelli</u>, 352 F.3d 48, 55 (2d Cir. 2003) ("Joint trials are often particularly

35

appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy."). In addition, the evidence related to the firearm charge against Cournoyer is straightforward and will be easy for the jury to segregate. Likewise, the additional evidence related to the CCE charge will relate to Cournoyer's role as an organizer of the Consortium, and will be distinct from Castillo-Medina's role as a distributor. See Carson, 702 F.2d at 367 ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance."). Accordingly, given that most of the evidence will be admissible against both Cournoyer and Castillo-Medina and otherwise easily set apart, there is no danger of inappropriate spillover prejudice and a joint trial is warranted.

Furthermore, limiting instructions which order the jury to "assess the evidence against each defendant separately from the proof against the other defendants" are used by courts in this circuit to protect against spillover prejudice while preserving the substantial benefits of a joint trial. United States v. Villegas, 899 F.2d 1324, 1347 (2d Cir. 1990); see also United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997)(noting that spillover prejudice may be remedied through clear judicial instructions); United States v. DeVillio, 983 F.2d 1185, 1192-93 (2d Cir. 1993). Such limiting instructions will successfully

36

mitigate any concerns of spillover prejudice. <u>See</u> <u>United States</u> <u>v. Bari</u>, 750 F.2d 1169, 1178 (2d Cir. 1984) (upholding denial of severance noting that the district court "district court carefully instructed the jury to consider the acts of each defendant distinctly in deciding his role in the conspiracy"). Therefore, limiting instructions will further mitigate against any possible spillover prejudice against Castillo-Medina.

Castillo-Medina further argues that his case warrants severance from Galebi and Taloni because they are charged with conspiracy to export and distribute cocaine and he is not. But Galebi and Taloni's roles were very distinct and can be readily distinguished by the jury. Moreover, multiple defendants charged in one indictment and tried jointly may be charged with different crimes. <u>See</u> <u>United States v. Barret</u>, 824 F. Supp. 2d 419 (E.D.N.Y. 2011) (denying motion for severance where movant was not charged with serious crimes attributable to her co-defendants) (citing <u>United States v. Rosa</u>, 11 F.3d 315). For example, in <u>United States v. Rosa</u> the Second Circuit affirmed the district court's denial of a severance motion in a narcotics conspiracy case. In that case, two members of the drug conspiracy, Rosa and Rodriguez, had contended that since they did not participate in the acts of violence that their co-defendants were charged with the case against them should be severed. In affirming the district court's ruling, the Second Circuit found

37

that because "each of them was an integral part of the conspiracy, Rodriguez as a heroin processor, and Rosa as a principal wholesale purchaser of heroin for the Organization . . . [e]vidence of the workings of the conspiracy would . . . have been admissible at the individual trials of Rosa or Rodriguez, had they been tried separately." Id. at 341-42.  Similarly, although Castillo-Medina did not commit every offense charged in the indictment, he played in integral role in the entire scheme's success.  Accordingly, severance from Galebi and Taloni is also inappropriate.

Finally, Castillo-Medina also argues that he should be severed from defendant Taschetti.  The defendant claims that the evidence against Tashetti would prejudice him because it would wrongly imply that Castillo-Medina might have been involved in a conspiracy to commit criminal activity while he was incarcerated.  But Castillo-Medina will not suffer any prejudice because, as set forth above in section III, his participation in the conspiracy continued after his incarceration given that he never withdrew from it.  Indeed, Taschetti also acted as a marijuana distributor on behalf of Cournoyer in the New York City area, and thus was responsible for the importation and distribution of marijuana in the same manner as Castillo-Medina.  Accordingly, the evidence collected against Taschetti is admissible against Castillo-Medina as it proves the ongoing nature of the massive narcotics and

money laundering conspiracy of which Castillo-Medina was deeply involved.


IV.      A JOINT TRIAL WILL NOT VIOLATE CASTILLO-MEDINA'S SIXTH
         AMENDMENT RIGHT TO CONFRONTATION

Castillo-Medina argues that his Sixth Amendment right to confront witnesses will be violated if his case is not severed because there is a strong likelihood that one of his co-defendants made statements upon their arrest and the government will seek to introduce those statements at trial. (Def.'s Mot. at 6).  Because there are no post-arrest statements by his co-defendants directly implicate Castillo-Medina, this argument has no merit.

The Confrontation Clause of the Constitution grants a criminal defendant the right to confront witnesses against him. U.S. CONST. AMEND VI.  The defendant's Sixth Amendment confrontation right includes the "the right not to have the incriminating hearsay statement of a non-testifying codefendant admitted in evidence against him."  Mason v. Scully, 16 F.3d 38, 42 (2d Cir. 1994) (citing Bruton v. United States, 391 U.S. 123, 137 (1968)).

In Bruton, the Supreme Court held that, at a joint trial, a defendant's Confrontation Clause rights were violated by

39

the admission of a co-defendant's confession to law enforcement that implicated the defendant. Bruton, 391 U.S. at 135-36. Admission of a co-defendant's confession may violate Bruton where the accusation against the defendant is only implicit, as where the prosecution elicits testimony that the co- defendant's confession led police to arrest the defendant. See Ryan v. Miller, 303 F.3d 231, 248-49 (2d Cir. 2002).  There is no violation of Bruton, however, where the co-defendant who made the confession testifies at trial and is subject to cross-examination by the defendant and where the co-defendant's testimony would have been relevant and admissible against the defendant in a separate trial.  See United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999). Moreover, where the government does not intend to offer any statements that directly incriminate the defendant, there is no violation of Bruton.  See United States v.Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989) ("a defendant's Bruton rights are violated only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence.") (internal citation and quotation marks omitted) (citing Richardson v. Marsh, 481 U.S. at 208-09) (explicitly rejecting a "contextual" approach, in favor of a "facially incriminating" standard and holding that whether a co-defendant's statement would be incriminating when linked to other evidence in this case it not relevant if the statement is not incriminating

40

on its face).

Here, there is no <u>Bruton</u> issue.  None of Castillo-Medina's co-defendants made any statements upon arrest that directly implicate Castillo-Medina.  Accordingly, Castillo-Medina's motion for severance on this ground should be denied.

## VI.  A JOINT TRIAL RESPECTS DOES NOT VIOLATE CASTILLO-MEDINA'S SPEEDY TRIAL RIGHTS

Castillo-Medina argues that he should be granted a severance to protect his right to a speedy trial.  (Def.'s Mot. at 8).  Specifically, he alleges a severance is warranted because (a) he is only charged with conspiracy to import marijuana (Count Two), conspiracy to distribute marijuana (Count Three) and a money laundering conspiracy (Count Seven), and therefore, his case is "simpler" than that of Cournoyer and (b) Racine, who is currently fighting extradition in Canada, might not be extradited in a timely manner as to warrant an unnecessary delay.  (<u>Id</u>.)  Castillo-Medina's argument concerning severance against Cournoyer is unwarranted, and the argument regarding Racine is premature.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. CONST. AMEND. VI.  This right is codified by the Speedy Trial Act of 1974 (the "Act") which sets deadlines to formally charge and bring to trial defendants in federal prosecutions.  <u>See</u> 18 U.S.C. §§ 3161-3174.  The Act fixes a 70-day limit in which to begin the trial.  The 70-day period commences from the

41

date the indictment or information is filed and made public or
"the date the defendant has appeared before a judicial officer,"
whichever occurs last. 18 U.S.C. § 3161(c)(1). When a case
involves multiple defendants, the 70 days are counted from the
final defendant's appearance. See United States v. Pena, 793 F.2d
486, 489 (2d Cir. 1986); United States v. Piteo, 726 F.2d 50 (2d
Cir. 1983).

There are a variety of circumstances in which delay is
properly excludable from the 70-day period. The Act allows for a
"reasonable period of delay . . . when a defendant is joined for
trial with a co-defendant as to whom the time for trial has not
run and [where] no motion for severance has been granted." 18
U.S.C. § 3161(h)(6). Moreover, complex cases warrant exclusion
under the Act. In a designated complex case, the Second Circuit
gives the district court judge broad discretion to grant
exclusion when "in its view the case's complexity makes it
necessary to grant counsel further time to prepare in order to
ensure a fair trial." United States v. Gambino, 59 F.3d 353, 357
(2d Cir. 1995) (citing United States v. Rojas-Contreras, 474 U.S.
231, 236 (1985)). However, the length of exclusion for
complexity must be not only limited in time, but also reasonably
related to the actual needs of the case. See United States v.
Beech-Nut Nutrition Corp., 871 F.2d 1181, 1198 (2d
Cir.) ("indefinite delay" not tolerated), cert. denied, 493 U.S.

42

933 (1989); <u>United States v. LoFranco</u>, 818 F.2d 276, 277 (2d Cir. 1987)(per curiam); <u>accord</u> <u>United States v. Clymer</u>, 25 F.3d 824, 828 (9th Cir. 1994) (continuance under § 3161(h)(8)(A) may not be open-ended).

Castillo-Medina's argument that his speedy trial rights will be violated if his case is not severed from Cournoyer is unsubstantiated.  Contrary to Castillo-Medina's argument, the charges against Castillo-Medina are not "simple" charges warranting a severance.  In fact, this case was designated a "complex case," in part because of the money laundering conspiracy, to which Castillo-Medina is also charged and exclusion is properly applied.  <u>See</u> <u>Gambino</u>, 59 F.3d at 358; <u>Rojas-Contreras</u>, 474 U.S. at 236.  As stated above, the marijuana conspiracies and money laundering conspiracy in which Castillo-Medina are charged are integral to the narcotics organization lead by Cournoyer.  A joint trial will allow for a coherent presentation of the conspiracy and will avoid the waste of holding two trials on substantially similar facts and evidence.  Second, the delay is not "open ended" but rather the parties are currently engaging in motion practice to narrow the triable issues so that a trial date can be set.  <u>See</u> <u>Gambino</u>, 59 F.3d at 358 ("[g]enerally a trial court should set at least a tentative trial date in granting a complex case exclusion"); <u>see also</u> <u>Beech-Nut Nutrition Corp.</u>, 871 F.2d at 1198 (favoring a set trial

43

date in granting delay).  Accordingly, due to the pending
motions, the speedy trial time has been tolled.  Moreover,
district courts in this circuit have recognized that certain
cases, particularly complex drug conspiracies with multiple and
foreign defendants, require additional preparation time in order
to ensure an adequate trial. See United States v. Molina-Chacon,
625 F. Supp. 338, 338 (E.D.N.Y. 1985) (suspending time
requirements of the Act noting that the case was a complex
"multi-defendant, international, drug smuggling and money
laundering case") aff'd sub.nom, United States v. Di Tommaso, 817
F.2d 201, 210 (2d Cir. 1987); see also United States v. Horvath,
1995 U.S. Dist. LEXIS 10065 *23 (N.D.N.Y. 1995) (granting
continuance in a multi-defendant drug trafficking conspiracy
because given the "relatively complex set of facts underlying the
conspiracy it is unreasonable to expect adequate preparation for
trial within the time allowed under the [Act].").

       Finally, to the extent Castillo-Medina seeks severance
from Racine because he is currently awaiting extradition in
Canada, this request for severance is premature.  As stated
above, at this point, Castillo-Medina and his co-defendants are
currently engaging in discovery and motion practice and trial
clock has been tolled.  Moreover, a trial date has yet to be
scheduled.  Accordingly, Castillo-Medina's argument for a
severance from Racine is premature until such time a firm trial

date is scheduled.  Depending on the timing of Racine's extradition and the Court's trial calendar, a severance of Racine from the defendants currently pending before the court may be warranted.  This would not, however, be a basis for severing Castillo-Medina from the remainder of his co-defendants. Therefore, Castillo-Medina's motion on this basis should be also denied.

<u>CONCLUSION</u>

        For the foregoing reasons, the Court should deny the defendant's motions in their entirety.

Dated:     Brooklyn, New York
           July 13, 2012

                          Respectfully submitted,

                          LORETTA E. LYNCH
                          United States Attorney
                          Eastern District of New York


                    By:  _____/s/_____
                          Steven L. Tiscione
                          Toni M. Mele
                          Celia A. Cohen
                          Assistant United States Attorneys


cc:  All Defense Counsel (by ECF)
     Clerk of Court (SLT) (by ECF)